(No. 48789.—

ROBERT G. DAY, Appellant, v. REGIONAL TRANS-
PORTATION AUTHORITY *et al.*, Appellees.

*Opinion filed May 20, 1977.*

534

Alan R. Johnston, Jeffrey D. Colman, Marsha E. Huff, and Lisa M. Hill of Jenner & Block, of Chicago (Robert G. Day, of Day & Day, of Peoria, of counsel), for appellant.

Don H. Reuben, James C. Munson, and Mary D. Allen, all of Chicago (Kirkland & Ellis, of counsel), for appellee Regional Transportation Authority.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, Robert G. Day, filed this action for declaratory judgment in the circuit court of Sangamon County against the Regional Transportation Authority (RTA) and certain State officials challenging the constitutionality of particular bonding and finance provisions of the Regional Transportation Authority Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 701.01 *et seq.*) and a related provision of the Illinois Vehicle Code which allocates to the RTA a portion of vehicle registration fees paid by Chicago residents (Ill. Rev. Stat. 1975, ch. 95½, par. 2—119(d)). On motion of the RTA, the cause was transferred to the circuit court of Cook County, which entered an order granting the RTA's motion to strike and dismiss the complaint on the merits. We allowed direct appeal to this court pursuant to Supreme Court Rule 302(b). 58 Ill. 2d R. 302(b).

The Regional Transportation Authority Act, which became effective in 1973, contains comprehensive provi-

sions establishing a regional transportation authority to furnish public transportation services, facilities and funding in a six-county region consisting of Lake, Mc-Henry, Du Page, Kane, Cook and Will counties. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 701.01 *et seq.*) The scope and content of the Act have been reviewed in detail in this court's decision in *Hoogasian v. Regional Transportation Authority* (1974), 58 Ill. 2d 117, *appeal dismissed for want of a substantial Federal question* (1974), 419 U.S. 988, 42 L. Ed. 2d 261, 95 S. Ct. 298, and need not be fully restated here. It suffices for purposes of this appeal to review briefly the pertinent provisions of the Act and related statutes pertaining to the Authority's sources of revenue and its powers to incur indebtedness.

The Act contemplates that the RTA may receive revenue from various sources. Section 4.02 empowers the Authority to apply for, receive and expend grants, loans and other funds from Federal, State and local governments, departments and agencies. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.02(a).) Pursuant to section 4.03(b) the Authority may impose a public transportation tax upon all persons engaged in the RTA region in the business of selling motor fuel at retail for operation of motor vehicles on public highways at a rate not to exceed 5% of the gross receipts from such sales. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.03(b).) The imposition of a corresponding motor fuel use tax at the same rate is also authorized. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.03(c).) In addition, the Authority may impose a motor vehicle parking tax with respect to parking facilities situated within the RTA area. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.03(d).) The Authority is also empowered to generate revenues from the operation of its transportation services and facilities through the imposition of fares and other charges. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 702.04.) Still another source of revenue is found in section 4.09 of the Act, which provides as follows with respect to the allocation of

certain tax revenues from the State's general revenue fund for the use of the RTA:

> "As soon as possible after the first day of each month, beginning July 1, 1974, upon certification of the Department of Revenue, the Comptroller shall order transferred and the Treasurer shall transfer from the General Revenue Fund to a special fund in the State Treasury, to be known as the 'Public Transportation Fund', an amount equal to 3/32 of the net revenue realized from the 'Retailers' Occupation Tax Act', as now or hereafter amended, the 'Service Occupation Tax Act', as now or hereafter amended, the 'Use Tax Act', as now or hereafter amended, and the 'Service Use Tax Act', as now or hereafter amended, from within the metropolitan region during the preceding month. Net revenue realized for a month shall be the revenue collected by the State pursuant to such acts during the previous month from within the metropolitan region, less the amount paid out during that same month as refunds to taxpayers for overpayment of liability in the metropolitan region under such acts.

> All moneys deposited in the Public Transportation Fund, whether deposited pursuant to this Section or otherwise, are allocated to the Authority. Pursuant to appropriation, the Comptroller, as soon as possible after each monthly transfer provided in this Section and after each deposit into such Fund, shall order the Treasurer to pay to the Authority out of the Public Transportation Fund the amount so transferred or deposited. Such amounts paid to the Authority may be expended by it for its purposes as provided in this Act." (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.09.)

An additional source of revenue is contained in section 2—119(d) of the Illinois Vehicle Code (Ill. Rev. Stat. 1975, ch. 95½, par. 2—119(d)), which provides for allocation to the RTA of certain motor vehicle registration fees collected by the Secretary of State. The statute provides:

> "Of the moneys collected as a registration fee for each motor vehicle, excluding motorcycles and motor driven cycles, registered to an owner having an address in the City of Chicago, $14 of each annual registration fee for each such vehicle and $7 of each semiannual registra-

tion fee for each such vehicle shall be deposited in the Public Transportation Fund in the State Treasury. Moneys in the Public Transportation Fund shall be allocated and paid to the Regional Transportation Authority, as provided in the 'Regional Transportation Authority Act', enacted by the 78th General Assembly."

Section 4.04 of the Act contains detailed provisions relating to the RTA's power to issue and sell its negotiable bonds and notes up to a limit of $500 million. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.04.) Section 4.04(c) provides that all bonds and notes of the Authority shall be general obligations of the Authority secured by its full faith and credit and that "[n] o such bonds or notes shall constitute a debt of the State of Illinois." (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.04(c).) Bonds and notes shall be secured as provided in the authorizing ordinance, "which may include in addition to any other security, a specific pledge of and lien on any or all tax receipts of the Authority and on any or all other revenues or moneys of the Authority from whatever source which may by law be utilized for debt service purposes." (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.04(c).) Bonds and notes may also be issued with provision for the creation of a separate fund to provide for their payment and for deposit in such fund from any and all tax receipts of the Authority and other revenues. The principal question raised on this appeal concerns the legal effect of the following provisions contained in section 4.04(e):

"The State of Illinois pledges to and agrees with the holders of the bonds and notes of the Authority issued pursuant to this Section that the State will not limit or alter the rights and powers vested in the Authority by this Act so as to impair the terms of any contract made by the Authority with such holders or in any way impair the rights and remedies of such holders until such bonds and notes, together with interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceedings by or on behalf of such holders, are fully met and discharged. In

addition, the State pledges to and agrees with the holders of the bonds and notes of the Authority issued pursuant to this Section that the State will not limit or alter the basis on which State funds are to be paid to the Authority as provided in this Act, or the use of such funds, so as to impair the terms of any such contract. The Authority is authorized to include these pledges and agreements of the State in any contract with the holders of bonds or notes issued pursuant to this Section." Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.04(e).

Plaintiff's initial contention is that the issuance of bonds by the RTA constitutes the creation of "State debt" in violation of the following provisions of section 9 of article IX of the 1970 Illinois Constitution:

"(a) No State debt shall be incurred except as provided in this Section. For the purpose of this Section, 'State debt' means bonds or other evidences of indebtedness which are secured by the full faith and credit of the State or are required to be repaid, directly or indirectly, from tax revenue and which are incurred by the State, any department, authority, public corporation or quasi-public corporation of the State, any State college or university, or any other public agency created by the State, but not by units of local government, or school districts.

(b) State debt for specific purposes may be incurred or the payment of State or other debt guaranteed in such amounts as may be provided either in a law passed by the vote of three-fifths of the members elected to each house of the General Assembly or in a law approved by a majority of the electors voting on the question at the next general election following passage. Any law providing for the incurring or guaranteeing of debt shall set forth the specific purposes and the manner of repayment.
* * *
(f) The State, departments, authorities, public corporations and quasi-public corporations of the State, the State colleges and universities and other public agencies created by the State, may issue bonds or other evidences of indebtedness which are not secured by the full faith and credit or tax revenue of the State nor required to be repaid, directly or indirectly, from tax revenue, for such

purposes and in such amounts as may be authorized by law."

Plaintiff urges that the State's pledge provided for in section 4.04(e) (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.04(e)) must be read in conjunction with the tax allocation provisions of section 4.09 of the Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.09). He argues that the legal effect of these two provisions, when read together, is the creation of a contractual obligation on the part of the State to provide continued funding to the RTA which can not be altered by future action of the legislature as long as bonds are outstanding; that this commitment constitutes a pledge of the State's credit and provides a form of guarantee for payment of RTA bonds; and that the issuance of bonds by the RTA thus has the effect of creating "State debt" without compliance with the requirements of section 9(b) of article IX of the Constitution.

The question of whether the RTA Act creates "State debt" was previously considered by this court in *Hoogasian v. Regional Transportation Authority* (1974), 58 Ill. 2d 117. It was there pointed out that the term "State debt" as defined in section 9(a) of article IX of the Constitution does not include bonds or other evidences of indebtedness incurred by units of local government. (58 Ill. 2d 117, 126-28. See also *People ex rel. Hanrahan v. Caliendo* (1971), 50 Ill. 2d 72.) It was also observed that the establishment of the RTA did not of itself constitute the creation of "State debt," nor did the Act indirectly do so because of the fact that the RTA was authorized to issue bonds and notes. It was noted that there were no provisions in the Act which contradict the legislative declarations as to the Authority being a unit of local government or the debts created thereby not being considered "State debt." With respect to the pledge provisions contained in section 4.04(e) of the Act, the court concluded: "The foregoing provisions do nothing

more than recognize an already existing obligation on the part of the State to the Authority's note and bond holders not to impair their contractual relationship with the Authority, and clearly do not have the effect of creating 'State debt' within the meaning of article IX of the Constitution." 58 Ill. 2d 117, 128.

The plaintiff points out that in *Hoogasian,* the parties did not raise any issue with respect to the effect of the tax-allocation provisions of section 4.09 of the Act and that the opinion did not specifically address this question. However, we are unable to concur with the plaintiff's arguments concerning the significance of section 4.09 with reference to the question whether or not "State debt" is created and are of the opinion that the rationale and holding of the *Hoogasian* opinion on this issue are determinative here. The fact that the legislature has provided by law in section 4.09 for the allocation of certain tax revenues to the RTA for its general purposes, and has further provided that the State pledges not to limit or alter the basis on which State funds are to be paid to the Authority, or used by it, so as to impair the terms of any contract, does not alter the conclusion that RTA bonds constitute indebtedness incurred by a unit of local government. As indicated above, section 9(a) of article IX of the Constitution expressly provides that the term "State debt" does not include bonds or other evidences of indebtedness incurred by units of local government. We do not agree with the plaintiff's suggestions that the pledge contained in section 4.04(e) of the Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.04(e)), when read in the context of section 4.09 (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 704.09), creates an obligation of the State to RTA bondholders beyond the existing obligation to them under the State and Federal constitutions not to enact laws impairing the obligation of their contracts. (U.S. Const., art. I, sec. 10; Ill. Const. 1970, art. I, sec. 16.) In our

opinion, these provisions do not in themselves create "State debt," nor does the issuance of bonds by the RTA have the effect of creating such debt within the purview of the constitutional provisions here in question. We are here concerned strictly with indebtedness incurred by a unit of local government and therefore hold that the provisions of section 9(a) and 9(f) of article IX of the Constitution are not applicable.

Furthermore, we are of the opinion that sections 4.04(e) and 4.09 of the Act, when read together, do not constitute the guarantee of "other debt" within the meaning of section 9(b) of article IX of the Constitution. The RTA is the sole obligor of its bonds, and there is nothing in the Act which contemplates that the State will guarantee payment of any portion of the bonds if the RTA should default. The State makes no assurances to the bondholders that funds allocated to the RTA will be sufficient for the retirement of the bonds or even that such tax moneys will be used for bond-retirement purposes.

The cases cited by plaintiff are distinguishable on their facts. *People ex rel. City of Chicago v. Barrett* (1940), 373 Ill. 393, was concerned with the constitutionality of the Motor Fuel Tax Act, which provided that counties and municipalities could request certain State officials to issue and sell notes which were payable solely from the county's or municipality's share of motor fuel taxes collected by the State. Proceeds from the sale of the notes were to be used by the county or municipality to pay for local highway projects. It was there held that, notwithstanding statements to the contrary appearing in the Act, the notes issued thereunder were State debts not only in form but also in substance by virtue of provisions of the Act which purported to require the State to maintain each county's or municipality's share of motor fuel taxes at certain levels based upon the amounts required to pay the notes. *Rosemont Building Supply, Inc. v. Illinois Highway Trust Authority* (1970), 45 Ill. 2d 243, dealt with the validity of

the Illinois Highway Trust Authority Act, which created an authority with power to issue bonds to finance the construction of highways and related facilities which were to be leased to the State. The bonds were secured by an assignment of the leases with the lease proceeds being used to pay the bond indebtedness. In holding the Act unconstitutional, the court concluded that the Authority possessed neither administrative nor financial autonomy and was not independent from the regular State government. To the contrary, the Authority was in reality a mere extension of the Department of Public Works and Buildings and was financially dependent upon the State as its only realistic source of repayment of its bonds. It was on this basis that the obligations of the Authority were deemed to be obligations of the State issued in violation of section 18 of article IV of the 1870 Constitution. Unlike the situation in *Barrett* and *Rosemont,* the RTA bonds are obligations of an independent unit of local government and are not payable solely from State revenues. Furthermore, there are no provisions in the Act which require the State to maintain funding of the Authority at levels sufficient to repay the bonds.

Plaintiff also relies upon *Bowes v. Howlett* (1962), 24 Ill. 2d 545, which involved the constitutionality of an act creating the Illinois Industrial Development Authority, which was empowered to construct and lease industrial properties and to issue revenue bonds which were to be paid out of a special fund. The statute provided for the mandatory transfer of State revenues to the special fund of up to $500,000 per year to pay for debt service on the contemplated 40-year revenue bonds. In holding the Act to be unconstitutional, the court concluded that the transfers from the State's general revenue fund to the special fund for the purpose of guaranteeing payment of revenue bonds so long as any bonds were outstanding constituted an unauthorized pledge of the State's credit and an illegal continuing appropriation in violation of

section 18 of article IV of the 1870 Constitution. In contrast to the act construed in *Bowes,* the RTA Act contains no requirement that State funds in a given amount be paid to the RTA for the exclusive purpose of paying bond indebtedness, and there is no element of State guarantee as there was in *Bowes.* Furthermore, it is apparent that the constitutionality of the RTA Act must be determined under the 1970 Constitution, which does not prohibit appropriations which continue beyond one fiscal year. *People ex rel. Ogilvie v. Lewis* (1971), 49 Ill. 2d 476.

In view of our conclusion that the issuance of bonds by the RTA does not constitute the creation of "State debt," we must disagree with the plaintiff's further arguments that the RTA Act involves an unconstitutional delegation of legislative power to the RTA to pledge the State's credit and that section 4.04(e) involves an unconstitutional surrender of the General Assembly's exclusive power of taxation contrary to section 1 of article IX of the State Constitution. We likewise find no merit to the contention that the issuance of RTA bonds containing the State's pledge denies voters equal protection of the laws by preventing future changes in the tax laws or deprives them without due process of law of their right to elect candidates pledged to reduce or alter State sales and use taxes and motor vehicle registration fees.

Plaintiff also urges that there are irreconcilable inconsistencies between the provision contained in section 4.04(c) that RTA bonds shall not "constitute a debt of the State of Illinois" and the provisions of section 4.04(e) which contain the State's pledge to bondholders. It is argued that, in view of this alleged ambiguity, prospective bondholders will be misled by the pledge provisions which are authorized to be printed on the face of the bonds. Plaintiff contends that these provisions are thus unconstitutionally vague, indefinite and uncertain and should be declared invalid. Plaintiff's arguments in this regard are

premised on his view that the pledge provided for in section 4.04(e) indicates that State funds are guaranteed for the retirement of RTA bonds. We do not agree that the language in question is susceptible of that interpretation. Pursuant to section 4.04(e), the State simply pledges to the holders of RTA bonds and notes that it will not limit or alter the basis on which State funds are to be paid to the Authority as provided in the Act, or the use of such funds, so as to impair the terms of any such contracts. As we have discussed earlier in this opinion, we do not believe it is possible to construe this language as indicating that the State has undertaken an obligation to guarantee payment of the RTA bonds in the event of default by the RTA; or that the State has committed itself to allocate sufficient funds to the RTA for retirement of the bonds; or that the funds so allocated will be used by the RTA for bond-retirement purposes. We find no inherent ambiguities or inconsistencies in these provisions and do not agree with the suggestion that prospective bondholders are likely to be misled thereby.

We turn next to a consideration of the validity of section 2—119(d) of the Illinois Vehicle Code (Ill. Rev. Stat. 1975, ch. 95½, par. 2—119(d)), which provides that a specific portion of registration fees for motor vehicles registered to owners having an address in the city of Chicago are to be deposited in the Public Transportation Fund for the use of the RTA. Plaintiff points out that the entire amount of motor vehicle registration fees paid by persons residing outside the city of Chicago goes into the State's road fund (Ill. Rev. Stat 1975, ch. 95½, par. 2—119(e)) to be used for general highway purposes on a statewide basis (Ill. Rev. Stat. 1975, ch. 127, par. 144.3), including the retirement of bonds issued under the Transportation Bond Act (Ill. Rev. Stat. 1975, ch. 127, par. 701 *et seq.*), whereas motor registration fees paid by Chicago residents are divided between the RTA and the road fund (Ill. Rev. Stat. 1975, ch. 95½, pars. 2—119(d),

(e)). It is suggested that Chicago residents accordingly bear a lesser burden for the operation of the State highway system than do non-Chicago residents. Plaintiff argues that the Act thus creates arbitrary and unreasonable classifications in violation of the due process and equal protection clauses of the State and Federal constitutions, fails to tax residents of the State uniformly in violation of section 2 of article IX of the State Constitution, and furthermore constitutes special legislation in violation of section 13 of article IV of our constitution.

It is apparent that plaintiff's objections go primarily to the alleged lack of uniformity in distribution of motor vehicle registration fees after collection rather than to the imposition and collection of such fees in the first instance. It is conceded that all residents of the State of Illinois, wherever they reside, are charged the same motor vehicle registration fees. As was stated in *Board of Library Directors v. City of Lake Forest* (1959), 17 Ill. 2d 277, 282: "While the uniformity of levy and assessment is the inexorable command of the Illinois constitution, this same standard of uniformity is not generally held to be applicable to the disposition of the tax after collection. [Citation.] The rule to be gathered from the cases decided in States which likewise have the constitutional limitation of uniformity, is that lack of uniformity in the imposition of a tax is fatal to the levy, but if the tax is imposed with equality and uniformity and collected for the public welfare, the rule does not apply to inequality of distribution." In any event, we are unable to concur with plaintiff's arguments that the allocation of motor vehicle registration fees as provided for in section 2—119(d) (Ill. Rev. Stat. 1975, ch. 95½, par. 2—119(d)) is either arbitrary, unreasonable or inconsistent with the objects and purposes of the RTA Act. It appears to us that the provision in question reflects a proper legislative recognition of the differences which exist between the city of Chicago and the balance of the State with respect to public

transportation usage, use of highways and transportation needs in general. We therefore conclude that section 2—119(d) does not violate the constitutional provisions cited by plaintiff.

In view of our determination that the complaint was properly dismissed, it is unnecessary to consider plaintiff's final contention that the circuit court of Sangamon County erred in transferring the cause to the circuit court of Cook County.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*